ISABELLE GROPPER,

*vs.*

THE NORTH CENTRAL TEXAS OIL COMPANY, INC.,
a Delaware corporation.

*New Castle, May 13, 1955.*

*Stewart Lynch,* of Hastings, Lynch & Taylor, Wilmington, and *Muccia & Muccia,* New York City, for plaintiff.

*Aaron Finger,* of Richards, Layton and Finger, Wilmington, and *Winslow M. Lovejoy,* of Lovejoy, Morris, Wasson & Huppuch, New York City, for defendant.

MARVEL, Vice Chancellor: Plaintiff seeks a preliminary injunction enjoining defendant, a Delaware corporation, from liquidating and making a cash distribution to its stockholders in the amount of $29 per share as a corollary to a proposed sale of its principal assets to North Central Corporation, a recently formed Delaware corporation. The agreement of sale of assets, the consummation of which plaintiff also seeks to enjoin, covers defendant's assets other than cash and United States Government securities, subject to a so-called retained production payment payable out of the operation of defendant's oil and gas interests. Filiorum Corporation, a California corporation, has agreed to purchase this payment from defendant for $4,250,000. The proposed undertakings of the defendant and of the purchasers and the tax consequences of the proposed arrangements are such as to assure payment of $29 per share to defendant's stockholders in the event that defendant's plans for going out of business which include dissolution are consummated.

Plaintiff, one of defendant's stockholders, makes her basic attack on the corporate actions sought to be enjoined on the grounds that [1] stockholder authorization of such actions was obtained by means of inaccurate and incomplete information furnished to stockholders in a management proxy letter of March 11, 1955, and that the proposed liquidation and sale are not, as represented by the proxy statement in the best interests of the corporation.

In her attack on the proxy statement, plaintiff charges that defendant failed to disclose to its stockholders that William Ewing, Jr., a former director of defendant and a partner of Morgan, Stanley and Co., a stockholder of the proposed purchaser, had played a

---

1. At a stockholders' meeting held on April 1, to vote on the proposed liquidation and sale, 86.6% of the outstanding stock voted for and 2.3%, including plaintiff's 100 shares, voted against such actions. Defendant's charter requires the affirmative vote of 70% of its outstanding stock for approval of a sale of its assets. § 271, *Title* 8, *Del.C.* permits a sale of assets when authorized by a majority of the voting stock unless the corporate charter requires the approval of a larger proportion of such stock. Defendant's outstanding stock consists of 230,800 shares of one class held by some 400 stockholders.

central role in the negotiations between buyer and seller prior to his resignation as a director of defendant. On this same theme of interest plaintiff argues that other directors and officers of defendant breached their fiduciary duty to defendant in voting for the sale and liquidation, after negotiations had been carried on at less than arm's length and that as such self-interest was not disclosed to stockholders, the proposed agreement of sale of assets is void.

Plaintiff further contends that the proxy statement was misleading in that it disclosed the book value of defendant's non-producing properties rather than their actual value. The complaint also alleges that the proxy statement incorrectly stated that the estimates of reserves set forth in an appraisal of defendant's assets made by Robert W. Harrison and Co. for the proposed purchasers were in substantial accord with defendant's own estimates.

Finally, insofar as information furnished to stockholders is attacked, plaintiff questions the accuracy of the proxy statement's gloomy picture of defendant's future prospects in the light of the corporation's past and prospective earnings, the availability of new producing properties, and the market for its stock.

Going outside the proxy statement the complaint charges that defendant should have obtained an independent appraisal of its assets and not relied on the purchasers' appraiser whose estimates plaintiff questions. While plaintiff urges that defendant's past and prospective earnings do not warrant liquidation and sale of defendant's assets, she insists that were such actions desirable a better price than $29 per share for defendant's stock could be obtained.

The Chancellor declined to enjoin the holding of a meeting of stockholders called to approve the proposed liquidation and contract of sale but he did restrain temporarily the carrying out of such acts in the event of stockholder approval pending a fuller development of the issues to be decided.

Stockholder approval having been obtained, the matter now to be decided is whether or not a preliminary injunction should issue, the effect of which, if granted, would enjoin consummation of defendant's liquidation and proposed sale of assets pending final hearing.

It has been established by the Delaware decisions that in the absence of evidence to the contrary the judgment of directors in fixing the terms and conditions of a sale, as in any other corporate act, is entitled to the presumption that it was exercised honestly and in good faith, *Robinson v.. Pittsburg Oil Refining Corp.*, 14 *Del.Ch.* 193, 126 *A.* 46, *Allaun v. Consolidated Oil Co.*, 16 *Del.Ch.* 318, 147 *A.* 257. Such presumption falls, however, when the votes of interested directors are necessary for approval of the corporate action under attack, *Keenan v. Eshleman*, 23 *Del.Ch.* 234, 2 *A.2d* 904, 120 *A.L.R.* 227, *Fletcher Cyclopedia, Corporations (Perm.Ed.)* § 936. Absent fraud such as was shown to exist in the *Eshleman* case, it would appear that where informed stockholders ratify a contract approved by interested directors, the burden of proving the contract unfair rests on the plaintiff, *Gottlieb v. Heyden Chemical Corp., Del.Ch.*, 91 *A.2d* 57. Compare *Robinson v. Pittsburg Oil Refining Corp., supra.*

The plan to liquidate and agreement to sell defendant's[2] assets arose as the indirect result of the efforts of one of defendant's directors, William Ewing, Jr., to find a buyer for 28.53% of defendant's stock beneficially owned by the Equity Corporation, a large investment corporation with diverse holdings. This initial effort, which was carried on late in 1953 and into 1954, failed. In June, 1954, however, Gilbert Kerlin, an attorney representing a group interested in buying the assets of a going oil business as a base for building future operations, came to Mr. Ewing on behalf of his clients with an offer to buy all of defendant's assets at a price which when combined with the proceeds of the oil payment would net defendant's stockholders $26 per share. The offered price was unsatisfactory to[3]

---

2. These assets consist of approximately 2,000 producing royalty interests, 16 producing leasehold interests, approximately 3,000 non-producing royalty interests, and 225 non-producing leasehold interests. These properties are scattered over 370 counties and parishes in 17 states.

3. E. A. McQuade, one of the two directors on defendant's board representing the interests of the Equity Corporation, turned down the $26 per share proposition.

the Equity Corporation, as had been other offers in the past, and sale discussions accordingly stagnated.

In July, 1954, another attorney, Garrard Winston, a member of Mr. Kerlin's firm, brought into the discussions the firm of Morgan, Stanley and Co. as well as customers of Dominick and Dominick, and shortly thereafter the original prospective buyers joined these new potential buyers in employing Theodore H. Swigart of Houston, Texas to act for them in locating a going oil and gas business such as defendant's. Mr. Ewing kept in touch with the status of the negotiations and arranged and attended conferences at which Mr. McQuade, Mr. Kerlin and Mr. Swigart were present. Negotiations having reached a point where it appeared that a purchase of defendant's assets might be consummated in which Morgan, Stanley and Co. would participate, Mr. Ewing on October 27, sold his stock in defendant corporation, consisting of 100 shares, at a price of $24⅝ per share. He resigned as director by letter dated October 26, personally delivered to defendant's president in Shreveport, Louisiana, on October 28, and accepted by the board in New York on November 4.

The offer of the purchasing group, which, if accepted and authorized by the stockholders, would assure defendant's stockholders the sum of $29 per share, was discussed informally at least as early as January 14, 1955, at a meeting of defendant's board and was formally approved at a board meeting held on February 3. On the same date a letter was addressed to stockholders by defendant's president notifying them of the plan to liquidate and sell corporate assets and that stockholders would receive $29 per share for their stock in the event of approval at a special stockholders' meeting to be held on April 1. On March 11, 1955, a detailed proxy statement was mailed out to the stockholders together with formal notice of the special meeting to be held April 1.

Plaintiff complains that the omission of specific information in the proxy statement on the activities of Mr. Ewing, who is a beneficial owner of stock in the purchasing corporation, prior to the contract of sale and the failure to disclose that other directors were "interested" taint the proposed contract with fraud.

It is conceded that Mr. Ewing is a partner of Morgan, Stanley and Co. which has acquired a 13.51% interest in the stock of the prospective purchasing corporation, and he is also beneficiary of a trust which holds a 2.70% stock interest in the same corporation. These facts were disclosed in the proxy statement. Ewing's resignation as a director was accepted on November 4, 1954, almost three months before the proposed liquidation and sale of assets were approved by defendant's directors on February 3, 1955. Plaintiff has failed to establish the basic elements of a case within the rule of this Court that there shall be no conflict between a director's duty and his self-interest, *Guth v. Loft, Inc.*, 23 *Del.Ch.* 255, 5 *A.2d* 503. There is no showing that any of the seven directors who unanimously approved the sale on February 3, 1955, were "adversely interested", *Italo-Petroleum Corporation of America v. Hannigan*, 1 *Terry* 534, 14 *A.2d* 401. While it is expected that defendant's administrative officers, some twelve in number, will be employed without contracts by the proposed purchaser, such an arrangement is not in itself fraudulent, *Mitchell v. Highland-Western Glass Co.*, 19 *Del.Ch.* 326, 167 *A.* 831. Furthermore, defendant's principal officers, Arthur R. Carmody and Edwin L. Norton hold between them 13,533 shares of defendant's stock. If these directors and the Equity Corporation through its directors on defendant's board participated in a bad bargain, they have injured themselves, *Finch v. Warrior Cement Corporation*, 16 *Del.Ch.* 44, 141 *A.* 54. There has been no showing of any plausible motive which would cause such officers and principal stockholders to commit acts of self-injury. The proxy statement clearly sets forth that there is no agreement or understanding that any of defendant's officers or directors will receive stock in either North Central Corporation or in Filiorum Corporation and plaintiff has not attacked such statement as false. I conclude that defendant's stockholders were seasonably and adequately informed about the background, nature and consequences of the plan of sale and liquidation insofar as the part played by its directors, past and present, is concerned, *Kaufman v. Shoenberg, Del.Ch.*, 91 *A.2d* 786.

The principal objection to the sale raised before the Chancellor at the argument for an order restraining the holding of the

stockholders' meeting of April 1, was the alleged failure of the proxy statement to give an appraisal of defendant's non-producing interests, which were listed at book value. While plaintiff still urges that the value of such interests was misrepresented, it is no longer her principal objection. Significantly, plaintiff's case against this method of valuation, *i. e.,* the Meyerhoff affidavit of March 27, while questioning the accuracy of the book value of the non-producing interests does little to sustain the burden which plaintiff must carry. In fact such affidavit in its computations carries the non-producing properties at defendant's book value. While the finding of oil in close proximity to non-producing property tends to raise the value of such property, by the same token the repeated drilling of dry wells in the vicinity of non-producing lands inevitably leads to a writing down and eventual writing off of such properties. Defendant has followed the practice of carrying such properties on its books at cost until they produce, and I am not convinced that such valuation is improper in view of the uncertainties inherent in finding oil. It may be that the book value of defendant's non-producing properties is too high rather than too low. Moreover, assuming the correctness of the break down of valuation of defendant's producing interests and current assets set forth in the Harrison affidavit, which results in an appraisal of $23.98 per share for such assets, an ample margin for error exists in the event that the non-producing interests are in fact undervalued. The proxy statement clearly discloses that the non-producing interests are carried at cost on the company's books and in the Harrison report, and I am not convinced that there is anything improper or misleading in the presentation of such facts to the stockholders.

Plaintiff's most forceful attack is directed against the factual presentation of defendant's reserves set forth in the proxy statement, charging that they are grossly undervalued in the Harrison report which defendant accepts as being in substantial accord with defendant's own estimates of its reserves.

The Harrison report, which is summarized in the proxy statement, was prepared at the request of the individuals who later formed

North Central Oil Corporation. The report supports the loan of the Chase National Bank which is financing the purchase of the retained production payment by Filiorum Corporation and apparently has satisfied North Central Corporation that $29 per share for defendant's stock is a fair price. It will require approximately ten years to pay off the Chase National Bank loan and the Harrison report accordingly includes an estimate of production during such period.

The report made as of September 1, 1954, values defendant's proven leasehold and royalty interest at $4,704,480, which breaks down to $20.38 per share for each of defendant's 230,800 outstanding shares. Current net assets are valued at $843,919 or $3.60 per share and non-producing interests, taken at their book value of $635,793.27, as is made clear in the proxy statement, are equivalent to $2.75 per share. The total of these appraisals per share are below the offered purchase price, and has not been substantially increased by current net earnings.

Plaintiff contends, however, that defendant's own records disclose estimates of at least 1,000,000 more barrels of oil reserves than shown in the Harrison report and that the Harrison valuation of reserves is based on controlled rather than uncontrolled production and on an incorrect projection of overhead and tax obligations into the future. There is no showing made that uncontrolled production of oil and gas in any of the states in which defendant holds oil interests is likely at any time in the foreseeable future. If production controls were to be lifted, the expected consequences would be economically disastrous to an oil business of defendant's size, and I am of the opinion that estimates of recoveries on an uncontrolled basis over the next ten years are unrealistic. I am also convinced that the Meyerhoff affidavits do not disclose an understanding of the recognized discount factors including federal income taxes required to be applied against defendant's recoverable reserves in order to establish a fair market value of defendant's assets for a corporate purchaser.

As to the differences in reserves, I am convinced that notwithstanding plaintiff's analysis of such discrepancies the overall company

estimates are in fact substantially in accord with the Harrison estimates.

The differences which do exist in the two estimates arise out of the fact that the company's estimates of known reserves are derived from published statistical reports on the many oil fields in which defendant holds small interests, while the Harrison report is based on geologic analysis of each of defendant's interests. By using the same percentage of total reported reserves in a field as defendant's annual production from its interests in such field bears to the annual reported production of the entire field, defendant obtains a general picture of its reserves in a specific field. This method of computation does not take into consideration geologic factors which would tend to increase the reserves of those interests held by defendant in productive areas of an individual field. By the same token defendant has overvalued its interests which lie in an unproductive area of a generally rich field. On the other hand where defendant's interests are located in a field where uniform production occurs or where defendant's interests are scattered uniformly over a given field, the Harrison estimates prepared from geologic studies of defendant's separate interests, are in substantial agreement with defendant's.

The proxy statement stated that the Harrison estimates by fields had been examined by defendant's principal officers, Mr. Carmody and Mr. Norton. It also stated that the estimates in the Harrison report had been compared with defendant's estimates and that the two estimates were in substantial accord. While the proxy statement might well have been more explicit on this score, there appears to have been no material mis-statement in view of the results reached by the two methods of estimating reserves and the obvious explanation of the variations that exist, *Kaufman v. Shoenberg, supra*. The absence of any intent to mislead becomes more apparent when it is considered that the Harrison estimates cover not only total reserves but also estimated production, time of depletion and producing days, which were disclosed to stockholders and which were obvious factors. to be considered by the stockholders before voting for or against the sale.

Furthermore it was clearly pointed out in the proxy statement that the Harrison report was confined to estimates of proven reserves and had given no consideration to the fact that "additional horizons of production may exist in fields or leases presently producing". The report also excluded consideration of possible future oil recoveries by secondary production, except in those fields where such production method was then being employed.

As has been noted above, plaintiff also questions the honesty of defendant's directors' decision to sell which, according to the proxy statement, was based on defendant's past and prospective earnings, the price range of its stock, the increasing difficulty in obtaining new "mineral properties of merit at reasonable prices", and defendant's estimated reserves.

I have previously held that plaintiff has the burden of overcoming the presumption that defendant's directors have exercised honest business judgment. The proxy statement discloses a falling off in net earnings in 1953 and 1954 although a dividend rate of $1.25 per share has been maintained since 1950. Admittedly increased administrative expenses account for the falling off of earnings but this was disclosed. The statement further shows that the market price of $29 per share reached in the fourth quarter of 1954 is the highest at which the stock has ever sold and that while defendant spent $128,110 for new interests in 1954, its costs in participating in the drilling operation of three oil wells, one gas well and fourteen dry holes were $99,122.

Plaintiff does not question these operating statements and statistics except as to the successful drilling of new wells and the difficulty in obtaining new properties. As to new wells she fails to take into consideration defendant's fractional interests in the 1954 drilling activity testified to by Mr. Matthews in his deposition and reported in defendant's minutes. As to the availability of new properties plaintiff merely differs with defendant's directors. In brief plaintiff thinks that it would be better business for defendant to continue in business. The directors and a majority of the stockholders think differently.

■ The Harrison report, as has been noted, was prepared at the request of the purchasers and was also used to justify the loan of the Chase National Bank which is proposed to be used to purchase the production payment. Thus there were compelling reasons for the appraisal to be neither too high nor too low. The reputation and integrity of the Harrison firm are unassailable and there would appear to have been no need for defendant to have incurred the expense of another appraisal. Furthermore, as has been pointed out, defendant's overall estimates of its reserves are in substantial accord with the Harrison estimates of reserves. The absence of an outside appraisal under the facts of this case should not block the sale, *Sterling v. Mayflower Hotel Corp., Del.Ch.,* 89 *A.2d* 862. *Schiff v. RKO Pictures Corp., Del.Ch.* 104 *A.2d* 267.

■ Finally there is nothing in the pleadings, affidavits, depositions or other papers before the Court to sustain the charge that a better price than $29 per share could have been obtained, or could be obtained in the foreseeable future. Furthermore, the price offered in the pending liquidation and sale, which is free of corporate tax under § 337 of the *Internal Revenue Code, 26 U.S.C.A.,* enures to the benefit of all of defendant's stockholders. The offered price is the highest firm offer ever made for any of defendant's stock, publicly or privately. Since stockholders were first notified of the offer on February 3, a higher firm offer has not materialized.

■ An application for a preliminary injunction imposes on the plaintiff the burden of showing a reasonable probability of ultimate success, *Belle Isle Corporation v. MacBean,* 29 *Del.Ch.* 261, 49 *A.2d* 5; *Holladay v. General Motors Corporation,* 28 *Del.Ch.* 378, 43 *A.2d* 844; *Sandler v. Schenley Industries,* 32 *Del.Ch.* 46, 79 *A.2d* 606.

This rule applies whether the improbability of ultimate success is a question of law or a question of fact. Otherwise a plaintiff might expect to obtain a preliminary injunction by merely supporting his complaint for injunction by a sworn statement, *Allied Chemical & Dye Corporation v. Steel & Tube Co.,* 14 *Del.Ch.* 117, 122 *A.* 142.

On notice, an order will be entered dissolving the temporary restraining order entered April 1, 1955, and denying plaintiff's motion for a preliminary injunction.