Lawrence M. C. Smith,
Plaintiff,

*v.*

The Good Music Station, Inc., M. Robert Rogers, Theresa S. Rogers, Pierson Underwood, Elisabeth K. Underwood, and RKO Teleradio Pictures, Inc.,
Defendants.

*New Castle, January 30, 1957.*

*Henry M. Canby,* of Richards, Layton & Finger, Wilmington, and *Lucien Hilmer,* Washington, D. C., for plaintiff.

*Herbert L. Cobin, Wilmington,* and *Monroe Oppenheimer,* Washington, D. C., for defendants Good Music Station, Inc., M. Robert Rogers, Theresa S. Rogers, Pierson Underwood, and Elisabeth K. Underwood.

*S. Samuel Arsht,* of Morris, Steel, Nichols & Arsht, Wilmington, for defendant RKO Teleradio Pictures, Inc.

SEITZ, Chancellor: Plaintiff, a minority stockholder of the defendant, The Good Music Station, Inc. ("GMS"), seeks to enjoin or rescind a sale of its assets to the corporate defendant, RKO Teleradio Pictures, Inc. ("RKO"). The individual defendants are directors of GMS and along with plaintiff form the entire board. Plaintiff seeks other relief against GMS and the individual directors.

This is the decision after final hearing.

This is a "different" kind of so-called sale of assets case because it is not contended by plaintiff that, apart from the so-called Smith and Straus offers hereinafter considered, the value received was less than the fair value of the assets sold.

GMS has one class of stock and plaintiff owns 16⅔% thereof. At the time of the sale to RKO, the defendants, M. Robert Rogers ("Rogers") and Pierson Underwood ("Underwood") each owned 41⅔% of the stock. Shortly thereafter Rogers purchased a portion of Underwood's stock at a price agreed upon by them in March 1955 under an oral option agreement. Thus, Mr. Rogers now owns 50% of the stock and Underwood owns 33⅓%. The defendant Rogers was president and general manager of GMS. The defendant Underwood was program director.

If this opinion is to be kept within reasonable limits much of the background material must be omitted. About February 7, 1956, Rogers was contacted by Walter Grimes, a radio station brokerage

agent, who asked him to meet a representative of the Mutual Broad-casting System, which is wholly owned by RKO. Grimes mentioned that Mutual was losing its Washington affiliate and was "looking around". Rogers accepted the invitation. It is not contended that Grimes was the agent of either GMS or Rogers.

As a result of the meeting, which involved much maneuvering, RKO's broker wrote a letter to Grimes in the form of a formal offer by RKO to purchase 100% of the stock of GMS for about $335,000 in cash, with the proviso that notes payable on the 1955 balance sheet were not to be assumed by the purchaser. I emphasize that this was a stock purchase offer. The offer was to expire February 20, 1956. At the same time he wrote another letter to Grimes offering to employ Mr. and Mrs. Rogers as consultants at $15,000 a year for five years. This matter had been suggested by either RKO's representative or Grimes on the day of the meeting.

Grimes brought both letters to Rogers on February 9, at which time Rogers failed to show any enthusiasm for the offer. Whereupon Grimes volunteered that RKO might be willing to add the value of the net quick assets at the date of closing. Rogers said he would consider it. Rogers told Grimes that the employment offer was of no interest and returned that letter to Grimes.

Rogers immediately advised Underwood of the offer and they decided to offer the station for sale to a New York newspaper at the same price. However, the paper advised that it was not interested.

After the lapse of several days, during which time Rogers and Underwood discussed the offer, Rogers and Underwood decided to accept the offer provided the price was increased by the amount of the net quick assets at closing. On February 20, Rogers so advised Grimes.

Grimes was advised by Rogers that the $15,000 per year com-pensation agreement proposed was not satisfactory. Grimes asked Rogers how much he and his wife wanted and Rogers said $30,000 a year for ten years. This was slightly less than the compensation which the Rogers were then receiving from GMS. After some tele-

phone calls between the parties they agreed on a non-competition-consultant agreement for the Rogers which was to be incorporated into the written contract. This was accomplished not later than Thursday, February 23. The agreement as finally worked out provided that Mr. and Mrs. Rogers would not compete with RKO as consultants (later broadened) in the Washington area for a period of five years and would serve as consultants for $30,000 per year for five years with a right in RKO to cancel at the end of the first year upon payment of $70,000. The non-competition provision was to remain effective for five years even though the consultant provision was cancelled.

It should be noted that they were in effect accepting RKO's offer to purchase all the stock. Obviously this acceptance was impliedly conditioned upon their ability to get the plaintiff to sell his stock. Since plaintiff did not approve the action it is apparent that the February 20 offer is only background to the subsequent offer to buy the assets.

On Saturday, February 25, a meeting was held in New York in the office of Mutual's president, John B. Poor. It was attended by Poor, Rogers and the attorneys for GMS and RKO. The conferees approached the matter on the basis that no firm agreement had been reached. As a result of the conference RKO made a new offer which was incorporated in a letter of February 25, 1956 from RKO to Rogers, Underwood and GMS. It was executed by RKO but "accepted" by Rogers and Underwood with no designation of their corporate capacities. It provided for the sale to RKO of either 100% of the stock of GMS or at the seller's election if that was not feasible, all the assets of GMS for $291,250 cash ($300,000 less ½ of brokerage commission) plus the difference between current assets and current liabilities at closing, less certain note indebtedness of GMS. The equipment liabilities of GMS and the brokerage commission were to be assumed or to be paid by RKO. RKO also in effect assumed a liability in connection with a non-rent claim of GMS' landlord. The memorandum further provided that RKO and Rogers would enter into a consulting agreement on the terms therein stated.

In the light of subsequent events, it must be assumed that RKO elected to proceed with its alternative offer to purchase the assets at the amount agreed upon by RKO and Rogers and Underwood on February 25. I say this because Rogers caused a meeting of GMS' board of directors to be called for March 16, 1956 to consider RKO's February 25 offer to purchase the assets. On that same date a resolution was passed by the four directors present, plaintiff being absent, in which it is recited that, "* * * with the written consent of the holders of a majority of the voting stock issued and outstanding, the Board deems a sale of all the property and assets of the Corporation * * * on the terms and conditions set forth in the February 25, 1956 letter, expedient and for the best interest of the Corporation, * * *". It is not disputed that 8 *Del.C.* § 271 authorizes the corporation at any meeting of its board of directors to sell the corporate assets when authorized, *inter alia,* by written consent of the holders of a majority of the voting stock issued and outstanding. A formal contract of sale dated April 14, 1956, was executed by GMS and RKO implementing the action just described. Plaintiff argues that GMS was not bound until this date but in view of my conclusions herein I find it unnecessary to decide this point.

I now come to plaintiff's contentions. Plaintiff first argues at length that the February 25 letter agreement was not binding on GMS and was "void at law". The letter agreement was not signed on behalf of GMS as such. Moreover, it could not have any ultimate binding legal effect on GMS until it received the requisite statutory approval. I therefore agree that the February 25 agreement was not at that date binding on GMS. However, there is no reason why the memorandum could not be considered as an offer to GMS from RKO to purchase the corporate assets, particularly when RKO was dealing with the chief stockholders and executive officers of the corporation.

Plaintiff contends that because Rogers and Underwood, being directors and stockholders, signed the February 25 agreement it could not thereafter form a legal basis for the sale of assets. He says this is so because agreements by which corporate directors bind themselves in advance to vote in a pre-determined manner are void. But Rogers and Underwood did not attempt by this agreement to bind

themselves legally in advance to vote as directors in a particular way. Indeed they did not purport to sign on behalf of the corporation. In any event they negotiated what they thought were reasonable terms. Consequently, as a practical matter they would be expected to vote to approve the plan when presented to the board. Such action is inherent in any sale of assets plan negotiated by officer-directors. Indeed, the sale of assets statute fairly contemplates such a procedure. Plaintiff's contention is without merit.

Plaintiff also argues that the February 25 agreement was a fraud on the minority stockholder because part of the consideration for the sale passed to one of the director-stockholders. This argument is premised on the contention that the money to be paid the Rogers under the so-called non-competition and consulting agreement actually should go to GMS because it was in effect nothing more than a payment to get the Rogers to agree to the sale of assets. Thus, says plaintiff, such proceeds in equity belong to GMS.

Plaintiff does not contend that fair value was not received for the assets (the subsequent offers apart) and so there is no basis under the present facts for suggesting that Rogers was diverting corporate assets to himself. I have no doubt that the Rogers were not going to step out of the Washington radio market without securing substantial compensation for such abstention. There was no reason why they should. RKO, in seeking such an agreement, was bargaining for a consideration which only the Rogers could supply. It is therefore absurd to argue on this record that the Rogers should have executed a non-competition agreement of the type here involved without receiving compensation therefor.

Plaintiff attacks the validity of the existing Rogers' employment contracts with GMS in an attempt to show that the Rogers were not giving up anything of value. Assuming without deciding that the contracts were invalid, the record nevertheless demonstrates that the Rogers were giving substantial consideration in return for the consulting agreement. They had spent about ten years building up a reputation in the Washington area. Plaintiff also contends that the payments to be made under the agreement are far out of line with

the status of the Rogers and the amounts paid in the industry in that area for such contracts. On this point the record supports defendants rather than plaintiff.

Plaintiff next contends that the action taken by the directors on March 16, 1956, by which they authorized the sale of assets was invalid because no disinterested quorum was present. It is plaintiff's position that both Rogers and his wife were directors having a "peculiar personal interest" because, plaintiff argues, the Rogers would not have had their lucrative consulting contract had the assets not been sold. Therefore, says plaintiff, as directors, in voting for the sale of assets, they were also voting themselves into a lucrative contract calling for a minimum of activity.

Defendants deny that the Rogers had the type of interest which disqualified them from voting as directors. I have not been referred to any case where, special charter provisions aside, this point has been directly raised. Contrary to defendants' suggestion, the cases of *Cottrell v. Pawcatuck Co.*, 35 *Del.Ch.* 318, 116 *A.2d* 787, affirmed by Supreme Court, 128 *A.2d* 225, and *Baron v. Pressed Metals,* — *Del.* —, 123 *A.2d* 848, did not directly involve the point here presented.

It has been said that a director is deemed to have a disqualifying interest in a transaction when as a result of director action he may receive a financial benefit or be subjected to a financial loss, directly or indirectly. Spellman, *Corporate Directors,* § 465 (1931). Obviously this statement of the rule is too broad if literally applied because director action may affect the value of a director's stock. Yet I take it a director is not disqualified in such situations because he is also a stockholder. Compare *Bennett v. Breuil Petroleum Corp.,* 34 *Del.Ch.* 6, 99 *A.2d* 236. We must therefore look to the reason for the rule in order to test its applicability to "new" situations. In *Sterling v. Mayflower Hotel Corp.,* 33 *Del.Ch.* 20, 89 *A.2d* 862, 866, affirmed 33 *Del.Ch.* 293, 93 *A.2d* 107, 38 *A.L.R.2d* 425, we find the statement that:

> "The basis for the common law rule is the prevention of conflict between duty and self-interest or divided interest."

The alleged conflict arises here, according to plaintiff, because the Rogers when voting as directors to approve the sale knew they were thereby also obtaining a consulting agreement for themselves. Their action would only give rise to a conflict of interest if it could be said that they would be tempted to turn down a bona fide higher offer or approve the sale of the assets at less than their fair value so as to obtain greater compensation under their consulting agreement. Is this type of "interest" a disqualifying one under the common law rule?

First of all, this is not the situation where the Rogers were negotiating the consulting agreement with GMS, of which both were directors. The classic "disqualifying interest" cases generally involve situations where the director is dealing with his own corporation. Compare *Keenan v. Eshleman*, 23 *Del.Ch.* 234, 2 *A.2d* 904, 120 *A.L.R.* 227; *Italo Petroleum Corp. of America v. Hannigan*, 1 *Terry* 534, 14 *A.2d* 401.

Although the "interest" rule has many applications, it certainly has its limitations. If the possible conflict of interest is remote then, on balance, it would seem that such conflict should not constitute an absolute disqualification. Is the possible conflict remote in this situation? I think so because any sale of assets must ultimately receive stockholder approval. While such a safeguard has its limitations it is not to be presumed that the majority stockholders will sell at less than fair value. Moreover, where, as here, the person receiving such a contract is also a substantial stockholder, he will be somewhat restrained from "short-changing" himself. This is particularly true if he is comparing income with capital gain potential. I conclude that the Rogers were not disqualified from voting as directors because of "interest".

The "interest" of the Rogers, such as it is, should however be a fact to be considered when and if a charge is made that the consulting agreement was negotiated at the expense of the corporation. Assuming without deciding that where the votes of such directors are necessary to make a quorum the burden of showing fairness would be shifted to defendants, the plaintiff is in no better position because a

full showing of fairness is made. Let us look at some of the facts concerning the negotiation of the consulting agreement.

So far as the record shows the Rogers did not make the initial approach toward the solicitation of an employment or non-competition agreement. Such evidence as there is tends to indicate that the contract was required by the purchaser. This is a very usual type of agreement for a purchaser to require in order to protect his investment. Each of the Rogers was already holding an employment contract with GMS for a term of five years from May 3, 1955, producing income in excess of that provided for in the non-competition agreement. Moreover, Rogers was in reality a 50% stockholder and realistically was not concerned with the question of his future employment with GMS even if we assume that his agreement was invalid. Additionally, the Rogers had established themselves in this type of work in Washington over a period of about ten years. Consequently, it is inaccurate in fact to suggest, as plaintiff does, that the Rogers were not giving substantial consideration in return for the agreement. The agreement of sale is fair even when considered with the consulting agreement.

Plaintiff makes the argument that Rogers and Underwood had committed themselves to vote in advance for the sale of assets by negotiating the February 25 proposition. By so doing, plaintiff claims, they bound themselves in advance to a particular course of action and thus disqualified themselves as directors in connection with the vote on the sale. I have already held under a previous point that this contention is without merit.

I conclude that the sale was approved by requisite director action.

Since I have ruled that the director action was lawful, it is not necessary to pass upon plaintiff's contention that the vote of the interested stockholders could not validate their unlawful action as directors in approving the sale.

I next consider plaintiff's contention that the action of Rogers and Underwood in entering into the contract of April 14, 1956, on

behalf of GMS was a fraud on the corporation and on the minority stockholder for the following reasons:

1. At the time the contract was executed GMS had already received a higher offer from Straus.

2. At the time the contract was executed GMS had before it plaintiff-Smith's offer to pay a higher price.

3. The agreement was a fraud on plaintiff because Rogers, in reality a 50% stockholder, was obtaining a personal benefit from the sale which was not made proportionately available to plaintiff.

Although the sale of assets was approved by the GMS directors and stockholders on March 16, 1956, the implementing agreement was not executed until April 14, 1956. The reason for the delay is not here relevant. Plaintiff says that on April 11, Nathan Straus, the owner of a New York station, made an offer which was higher than the RKO offer. The parties are in disagreement as to whether GMS was then legally bound to sell to RKO. I shall assume not.

Defendants make several answers to plaintiff's claim with respect to the Straus offer but it is necessary to consider only one, namely, their assertion that Straus never made an unconditional offer to buy the GMS assets. Assuming without deciding that the Straus offer was higher than the RKO offer, a matter by no means free from doubt, the fact is that the so-called Straus offer was not in my opinion an unconditional offer to purchase the assets of GMS. The Straus offer was contained in a letter which was not addressed to anyone. It was not an offer to buy the assets of GMS but was rather an offer to the stockholders collectively to buy 100% of the stock of GMS. Moreover, it had other substantial infirmities. Thus, it was made conditional upon the reaching of an agreement on compensation for the general manager and station manager and satisfactory adjustments of various other relatively minor matters. Finally, the offer recites that it is for the stock "free and clear". It is very doubtful what the quoted language meant with respect to the net amount to be realized by GMS. The testimony of Straus did not materially aid plaintiff's cause.

■ The directors were not faced with the situation where they were confronted with an offer to purchase the assets which was within the rule concerning cash offers mentioned in *Robinson v. Pittsburgh Oil Refining Corp.*, 14 *Del.Ch.* 193, 126 *A.* 46. Clearly, a different situation would be presented if, other things being substantially equal, the board of directors accepted the lower of two bona fide cash offers. That is not this case. Nor was the matter at the stage where the directors had a duty to pursue it any further than they did, especially in view of the crucial time factor with RKO. The sale is not invalid because of the existence of the so-called Straus offer.

■ I next consider plaintiff's contention that the board had before it the plaintiff-Smith's offer to pay a higher price. This so-called offer was incorporated in a telegram from Smith in which he stated that he was against the sale to RKO and that he was "an interested purchaser on probably better terms". He sent a later telegram objecting to the proposed sale and stating that he would make a better offer to the stockholders if a fair opportunity was given. No such offer was ever forthcoming. Without laboring the point I conclude from the record that there was no offer from the plaintiff of the character which the directors and stockholders were entitled to consider seriously. The testimony of plaintiff himself amply supports this conclusion.

I have already considered and found wanting in merit plaintiff's contention that the sale was a fraud on plaintiff because the defendant Rogers obtained a personal benefit from the sale in the form of the consulting agreement which was not made available to plaintiff. The testimony amply supports the legality of the agreement.

I have not delineated in detail the background of this controversy and the numerous attempts over the years to dispose of the assets of the station at a substantially smaller figure. Nor do I desire to dwell upon the failure of plaintiff over the years to participate in actions which might have helped the station. I do say that the record amply supports the conclusion that the board and the majority stockholders of GMS were fully justified under the law in taking the action here under attack. It necessarily follows that there is no merit to the

charge that RKO, an arm's-length purchaser, somehow took advantage of GMS.

[10] Plaintiff also raises some question concerning the propriety of certain notes issued by GMS to Rogers and Underwood. These issues were not pleaded and so far as I know were not tried by tacit consent. Consequently, they will not be considered by the Court. The same is true of plaintiff's claim concerning the loans to Rogers and Underwood and the Hi-Fi claims.

Plaintiff also asserts a salary overpayment by GMS to the Rogers amounting to $600. These amounts were repaid when called to the attention of the Rogers and so need not be considered further.

I next consider plaintiff's contention that Rogers and Underwood each improperly received $2,500. These were sums which were accrued on the books of GMS as owing to Rodman and Geiger for salary. Plaintiff claims that when Rodman and Geiger (former stockholders of GMS) on April 6, 1955, sold their stock and income notes to Rogers and Underwood they waived their right to such accruals. They rely upon the following provision in the contract between those parties:

"It is further agreed that the Sellers shall not be entitled to any salary or other compensation as officers or directors for the year ending December 31, 1954, or for any portion of the current year."

The individual defendants, Rogers and Underwood, contend that Rodman and Geiger in effect assigned their salary claims to Rogers and Underwood at the time of the purchase.

It should be noted that the corporation (GMS) was not a party to this contract. Plaintiff nevertheless insists that by the terms of the contract the claims were waived rather than assigned. Plaintiff says the quoted language of the agreement is too clear to be varied by evidence of surrounding circumstances. I cannot agree where, as here, the corporation is not a party. The matter is far from clear and so testimony of the surrounding circumstances was admissible to help determine the intention of the parties. The admissible testimony

clearly shows that the parties intended to transfer the accruals to Rogers and Underwood. It may be noted that plaintiff was advised by letter some time ago that the accrued salaries in question were being held for the benefit of the purchasers (Rogers and Underwood). I conclude that as a part of the transaction with Rodman and Geiger, the defendants became entitled to their accrued salaries for 1954. Consequently, Rogers and Underwood are not required to account for such sums.

Since the record at the present time shows that neither plaintiff nor GMS is entitled to relief with respect to any of the matters properly presented to the Court, the complaint will be dismissed.

Order on notice.