189 A.2d 675 (1963)
Aida ABELOW et al., Appellants,
v.
MIDSTATES OIL CORPORATION, a Delaware corporation, Middle States Petroleum Corporation, a Delaware corporation, Tennessee Gas Transmission Company, a Delaware corporation, Appellees.
Supreme Court of Delaware.
March 1, 1963.
On Reargument April 5, 1963.
Daniel O. Hastings, Clarence W. Taylor and Russell J. Willard, Jr., of Hastings, Taylor & Willard, Wilmington, for appellants.
Henry M. Canby and Richard J. Abrams, of Richards, Layton & Finger, Wilmington, for appellees.
SOUTHERLAND, C. J., and WOLCOTT and TERRY, JJ., sitting.
SOUTHERLAND, Chief Justice.
Plaintiffs below, then stockholders of Midstates Oil Corporation, sued to enjoin a proposed sale of Midstates' assets to its majority stockholder, Middle States Petroleum Corporation. Injunctive relief was denied, and subsequently the suit proceeded as a non-derivative class suit to enforce an individual right. After trial the Vice Chancellor ruled for the defendants on the merits and dismissed the amended complaint. Plaintiffs appeal.
The facts are these:
At the times here important Midstates was a nonintegrated producing oil company. Ninety-six per cent of its stock was owned by Middle States Petroleum Corporation, and was Middle's only significant asset.
The companies had a common management. In January, 1957, the directors had *676 considered a possible sale of Midstates' assets, and in February, 1958, definite steps were taken to that end. On February 19 Dillon Read wrote a letter to Middle setting forth that it proposed to negotiate with a number of possible purchasers with a view to obtaining offers for the properties. On February 21 its proposal was approved.
On February 28 the Midstates management advised its stockholders of the desirability of a sale or merger of their company, and of the steps that had been taken. It added that if the acceptance of any offer should be deemed desirable, it would be submitted to stockholders.
One of the possible purchasers listed by Dillon Read was Tennessee Gas Transmission Company. On February 29 Middle wrote Tennessee, referring to the interest expressed by it and others in acquiring a part or all "of our capital stock or assets", and setting forth the conditions under which an offer was invited. Tennessee made some investigation of the properties. On May 1 it submitted an offer to exchange its own stock for the stock of Middle at the ratio of 45 shares of Tennessee common for 100 shares of Middle, subject to obtaining at least two-thirds in interest of the Middle shares. The offer stated that Tennessee would expect, after acquiring the controlling stock ownership, to liquidate and dissolve Midstates and Middle and transfer their properties to Tennessee.
On May 6 Dillon Read submitted to Middle a resume of five offers received by it. The offers differed in the method of acquisition, three contemplating the sale of assets of Midstates, one the assets of Middle and one (that of Tennessee) the exchange of Middle stock for stock of Tennessee.
Dillon Read recommended that only two offers, that of Tennessee and that of Pan American Oil Company, be considered. It pointed out that on a dollar basis Tennessee's proposal was slightly more favorable than Pan American's, and also that if 80 per cent of Middle's stock was obtained Middle's stockholders would not realize any taxable gain on the transaction.
On May 13 the directors of Middle met and unanimously approved Tennessee's proposal, and directed the officers to submit it to Middle's stockholders. The directors, as directors of Midstates, did not report the offer or their action to the minority stockholders of Midstates.
On June 26 the terms of the offer were communicated to Middle's stockholders, and they were advised of the directors' approval thereof. By October 1, 1958, 95.3 per cent of all the shares of Middle had been tendered for exchange. After July Tennessee was in complete control of Middle.
On December 5, 1958, Middle offered to buy all the assets of Midstates for $24,947,610 and assume its liabilities. This offer was accepted, subject to stockholders' approval at a special meeting called for December 30.
On December 29, 1958, just before the meeting, plaintiffs filed this suit, and sought to enjoin the sale. A temporary restraining order was denied. The stockholders' meeting was held and the transaction approved. 21,572.793 shares voted for; 143.86 against; and 458.9995 did not vote.
Plaintiffs on or about June 4, 1959, surrendered their stock for cancellation and received the liquidating dividend of $1125 a share.
After the sale was completed, various proceedings were had in the injunction suit, as a result of which it was permitted to continue as a class suit for individual relief in the form of damages, and the complaint was amended accordingly. The appearing defendants are Middle, Midstates, and Tennessee.
The case was tried before the Vice Chancellor on oral testimony and exhibits. Plaintiffs asserted various breaches of fiduciary duties against the defendants. *677 The defendants asserted that the only issue was the fairness of the price paid by Middle and adduced evidence to show that it was fair. The Vice Chancellor sustained this defense, and plaintiffs appeal.
Plaintiffs renew here their contention that the minority stockholders were unfairly treated because they were entitled to substantially more than $1125 a share.
In order to deal with their arguments the financial aspects of the transaction must be set forth.
The exchange of stock between Tennessee and the Middle stockholders was based on comparative market values of 28½ and 125/8 respectively. Tennessee did not make an appraisal of the assets, or attempt to relate the market value of the shares exchanged to the asset value of Midstates. It was furnished with an appraisal by Raymond Kravis, but this was later found to have overstated the assets in an appreciable amount.
Based on the market figures, the total outstanding stock of Middle was worth $30,462,076. On this basis all of the Midstates stock was worth $32,210,030, a valuation which would entitle a Midstates minority stockholder to $327.53 a share more than he actually received. By using the market value of Tennessee on December 30, 1958, the date of the sale, plaintiffs arrive at a much higher figure.
We have referred above to an offer received from Pan American. This offer was $41,676,000 for Midstates assets excluding cash and receivables. After deducting liabilities, preferred stock, etc., this yields $32,273,339 for Midstates common stock, or $330.35 per share more than was actually received. However, this was not a cash offer, since Pan American proposed that Midstates should reserve two production payments of $30,000,000 and $4,000,000. The actual cash to be paid was $7,676,000. Moreover, Pan American expressly said that its proposal "does not constitute a firm offer."
Defendants' valuation of Midstates assets rests upon two appraisals offered at the trial. The firm of Robert W. Harrison and Company, of Houston, Texas made an asset appraisal in accordance with a recognized method of appraisal in the industry. The qualifications and reputation of this firm appear to be unquestioned. (Cf. Gropper v. North Central Texas Oil Co., 35 Del. Ch. 198, 209, 114 A.2d 231.) Mr. Harrison arrived at a valuation of $23,600,000 which he rounded off to $24,000,000. After the addition of the remaining assets and the subtraction of the liabilities, there remained for each common share the liquidating dividend of $1125. This figure, it may be noted, is much higher than the average market value of $850 a share at the time of the submission of the Tennessee offer.
The second appraisal was made by the American Appraisal Company, another firm of recognized standing. It made a going-concern valuation, based on capitalization of earnings and other related factors, and arrived at a figure of $22,500,000.
No countervailing evidence of a comparable nature was adduced by the plaintiffs, and the Vice Chancellor accepted these appraisals as establishing the fairness of the price paid for Midstates assets.
In assailing his finding, plaintiffs make the following argument:
The fair value of the assets sold is not in this case the test of legality. Prior to the sale, and at the time of the Tennessee offer, Middle was guilty of a breach of fiduciary duty to Midstates minority stockholders, because it did not take steps to see that the Midstates minority received the same treatment as the Middle stockholders. The Tennessee exchange and the subsequent sale of assets, plaintiffs insist, were all part of one transaction  the intended liquidation of Midstates  and therefore the Midstates stockholders and the Middle stockholders must be paid off on the same basis. Middle failed in its duty when it did not insist that the Tennessee offer should include Midstates *678 stockholders. In any event, say plaintiffs, the value of Midstates established by the Tennessee exchange must be taken as conclusively establishing the fair value of Midstates assets for the purpose of the subsequent sale.
Plaintiffs further contend that the Middle board was guilty of a breach of trust in refusing to accept the Pan American offer, which involved a direct sale of Midstates assets  the action originally envisaged. This refusal deprived the Midstates minority of the benefit of a very favorable price. In any event, plaintiffs say, the Pan American offer must be taken as establishing the true value of Midstates for the purpose of the subsequent sale.
The fallacies in these arguments are plain. As for Tennessee's offer, it was restricted to Middle stockholders. After the Middle directors had determined that it was a favorable one they would have been guilty of a breach of duty had they not submitted it to their stockholders. And upon what theory of fiduciary duty were they required to negotiate further with Tennessee for the broadening of the offer to include the Midstates minority? Suppose Tennessee had refused to do so. What could Middle have done about it?
The basic error in the argument, however, is the contention that because Tennessee was willing to exchange its stock for Middle stock on a market value basis, a valuation of Midstates assets was thereby established for the subsequent sale. This is not so. If Tennessee wished to acquire the holding company's stock, what harm does the Midstates stockholder suffer? As defendants' counsel correctly says, he had after the Tennessee exchange just what he had before. Moreover, it is at least doubtful whether a comparison of a value based on market value of shares with asset value is of any assistance in this case. Cf. Sterling v. Mayflower Hotel Corporation, 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425 (comparison of market value of stock and asset value in merger disapproved). If the standard of market value be used for Midstates stock, the Midstates minority have received much more than $850 a share, as above noted.
As for the Pan American offer, it is to be noted that it was not firm, that it proposed only a relatively small cash payment, and that it would have created problems for Midstates in respect of its debt. It cannot be regarded as comparable with the Tennessee offer. Cf. Smith v. Good Music Station, Inc., 36 Del.Ch. 262, 272, 129 A.2d 242 (conditional offer not comparable with a firm one). In the light of these facts, we cannot say that the directors' decision to prefer the Tennessee offer was a breach of trust as respects Midstates stockholders. It appears to us to be nothing more than an exercise of judgment.
Nor, for the same reasons, did the Pan American offer establish a value for the purposes of the subsequent sale.
The fair value of the Midstates assets was established by the two appraisals made for the purpose. As against these findings, the Tennessee exchange and the Pan American offer are of little weight. Certainly the Chancellor was justified in his conclusion that the price was fair.
Much is said in plaintiffs' brief about the part that Middle  the corporation  played in the exchange transaction. The significance of this is greatly exaggerated. The transaction was, in fact and in law, an exchange of stock between Tennessee and the individual stockholders of Middle.
It is also said that the Midstates minority was not informed of the Tennessee offer, in spite of the assurance given in the letter of February 28, 1958, referred to above. Again plaintiffs are attempting to treat the Tennessee offer as one that in effect was made, or should have been made, to the Midstates minority. We have already rejected this contention.
An argument is made that Midstates should have solicited other offers, which might have been higher. This is pure speculation. *679 This argument also overlooks that in December, 1958 Tennessee had the power to merge Midstates into Middle by the use of the "short-merger" statute (8 Del.C. § 253), in which case the plaintiffs' sole remedy would have been an appraisal. Stauffer v. Standard Brands, Inc., Del., 187 A.2d 78.
In an attempt to fasten liability for breach of trust upon Middle, plaintiffs have cited many cases dealing with the duty of directors, and of majority stockholders, to the minority. This principle of fiduciary liability is so well established that citation or discussion of decisions is unnecessary. The basic question is almost always one of fact: Were the minority stockholders fairly treated?
We think that these plaintiffs have received their fair share of their company's assets.
The judgment below is affirmed.

ON REARGUMENT
It is insisted earnestly, and at great length, that the Court has fallen into grievous error. We are told that we have ignored the controlling principle of law  that when the minority is oppressively treated by the majority equity will right the wrong.
We did not overlook such an elementary rule; we held it inapplicable. The exchange of stock upon which the charge of fraud is based was an arms' length transaction between Tennessee and the individual stockholders of Middle. In effect, the directors of Middle did nothing more than to submit Tennessee's offer with their recommendation. In justice to their stockholders they could have done nothing less. At bottom, plaintiffs' grievance stems from the fact that Middle stockholders received from their voluntary exchange more than plaintiffs did on the corporate sale. But even if the Middle stockholders received too much, it does not follow that the Midstates stockholders received too little.
Counsel consider themselves aggrieved at the somewhat summary treatment of the many cases collected in their brief. Detailed discussion is quite unnecessary. It is conceded that defendants must establish the fairness of the price paid on the sale of assets. This they have done. The attempt to disparage the appraisals is unavailing.
Counsels' last point concerns plaintiffs' offer to prove the amount per share paid to the non-exchanging Middle stockholders after the merger of Middle into Tennessee. The Vice Chancellor rejected the evidence, and his ruling was not assailed on the appeal. We have difficulty in seeing the relevancy of the evidence offered. In any event, the point is raised too late.
We have carefully considered the petition and see no reason to change our opinion. The motion is denied.