Jack B. JACOBS, as Trustee in Dissolution of Market Publications, Inc., a dissolved Delaware corporation, et al., Plaintiffs,

v.

Joseph J. HANSON, et al., Defendants.

Civ. A. No. 77–500.

United States District Court,
D. Delaware.

Oct. 14, 1981.

294

William Prickett, and Vernon R. Proctor, of Prickett, Jones, Elliott & Kristol, Wilmington, Del., for plaintiffs.

David A. Drexler, and John E. Babiarz, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

This Opinion constitutes this Court's post-trial findings of fact and conclusions of law. The case was brought by the Trustee in Dissolution for Market Publications, Inc., ("Market") a dissolved Delaware corporation, on behalf of Market and a class comprised of a number of Market's former minority shareholders. The defendants, Joseph J. Hanson ("Hanson") and Alfred A. Spelbrink ("Spelbrink") were Market's former principal officers and majority shareholders. The defendants are alleged to have dissolved the corporation in such a fashion as to benefit themselves at the expense of the minority shareholders, in viola-

tion of Delaware law. They are alleged to have accomplished this by deliberately providing materially misleading information or intentionally concealing information from the minority shareholders in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Act").

Specifically, the defendants are alleged to have exploited their control of the corporation to obtain at its expense certain non-competition and consulting agreements in connection with the sale of Market's principal asset. Additionally, the plaintiffs assert that the defendants purchased certain corporate properties at prices that did not reflect the true value of these assets. Furthermore, they are accused of collecting unreasonable fees from the corporation while serving as liquidating trustees. Finally, Hanson and Spelbrink are accused of illegally charging the corporation for personal legal services.[1] Before considering plaintiff's allegation it is necessary to briefly review the history of this ill-fated corporation.

The defendants formed Market in 1964. The corporation was capitalized with two classes of common stock having equal voting rights. One hundred and fifty thousand shares of Class A were sold at One Dollar ($1.00) per share, with a liquidation preference of One Dollar ($1.00) per share. The purchasers of the Class A stock were largely friends and associates of the defendants in the magazine publishing industry. Hanson and Spelbrink were each issued approximately 78,000 shares of Class B stock for cash contributions of $2,500. Thus, Hanson and Spelbrink together held a majority of the total voting stock.

The initial publishing venture of Market was *Health Care Product News ("HCPN")*, which was launched in 1965. By 1967 this magazine showed a profit of almost $10,000. This figure rose to approximately $31,000 in 1968. The year 1968 marked the initiation of the corporation's second publishing venture, *Physicians' Marketplace.* In contrast

---

1. The plaintiff also alleged that the defendants had illegally charged the corporation for a variety of personal travel and entertainment expenses. These allegations have previously been dismissed for lack of proper jurisdiction. *See* 464 F.Supp. 777 (D.Del.1979).

to HCPN which was a "trade" magazine, *Physicians' Marketplace* consisted wholly of business reply cards that the reader could detach and mail directly to the advertiser. It was sent to physicians without charge on the basis of rented mailing lists. In 1969, *Lawyers' Marketplace* and *Dentists' Marketplace* were created, and in 1970 *Accountants'* (later CPA's) *Marketplace* was initiated, utilizing the same reply card format. The sole revenue of the *Marketplace* publications was advertising sales.

As a consequence of the start-up expenses associated with the new *Marketplace* publications, small losses of $11,000 and $11,900 were experienced by Market in 1969 and 1970, respectively. In 1971 and 1972, however, Market enjoyed its most profitable years, earning profits of $177,971 in 1971 and $93,576 in 1972.

In the wake of this success, Market began a number of new projects. In 1971 it formed "Media Productions" to produce filmstrips for business and educational use. In 1972 it founded *In-Service Training and Education*, a magazine aimed at the institutional health care market for in-house professional training programs. Also founded in 1972 was *Folio: The Magazine for Magazine Management* ("Folio"). As suggested by its title, *Folio* was a trade magazine for magazine publishers. Finally, *Book Production Industry*, a trade magazine for book publishers, was purchased in 1972.

Based on the previous years' profits, Market in 1972 and 1973 offered to redeem Class A shares at a price of $3.80 per share and $3.10 per share, respectively. Approximately 20,000 shares were redeemed pursuant to this offer.

Although the defendants apparently did not immediately recognize the full extent of their corporation's economic troubles, 1973 marked the beginning of Market's drift towards financial disaster. The corporation lost over $280,000 in 1973 and over $274,000 in 1974.

These losses were attributable to a number of factors. The *Marketplace* publications were severely damaged by a substantial increase in the cost of the heavy paper

stock that postal regulations required to be used for business reply cards. Thus, paper costs grew from $182,000 in 1972 to $312,000 in 1974. Additionally, during the 1973–74 period, postal rates for magazines rose dramatically. Market's postal expenses increased from $241,000 in 1972 to $325,000 in 1974.

Adding to the difficulties experienced by Market as a consequence of these steeply rising costs was the general downturn in the national economy which began with the first Arab oil embargo in 1973. Thus, Market's total revenues actually decreased from 1973 to 1974 and while there was an increase in 1975, it was only 3.9% above the 1973 level. The seriousness of Market's financial plight during the 1974–75 period is reflected in negative net worth figures of $436,000 at the close of 1974 and $544,000 at the end of 1975.

As noted above, the impending financial debacle was not immediately apparent to management in 1973. The increase in costs and the softening of advertising commitments were believed to be short term trends. Moreover, because of the inaccuracies and delays in the corporation's accounting system the magnitude of the 1973 loss was not known until 1974. Nevertheless, some retrenchment began in 1973; a hiring freeze was imposed, the corporation began to negotiate increased credit lines with its banks and extended the payment time on its creditors to alleviate its tightening cash position.

In 1974, further remedial actions were taken. *Folio* was converted from free to' paid circulation, resulting in a drop in circulation from 11,000 to approximately 3,500 copies and a corresponding decrease in production costs. The frequency of publication was reduced from nine issues per year to six. Additionally, the circulation of *HCPN* and the *Marketplaces* were reduced to save production and distributions costs. Various changes were made in sales personnel. Mr. Robert Dowling, one of the corporation's executives, was made chief financial officer. Despite these efforts the company was forced to borrow increasing amounts to

meet its obligations, and Hanson and Spelbrink personally guaranteed such loans for the company.

In early 1975, the corporation's financial crises came to a head. Hartford National Bank, Market's largest bank creditor, called its loan. Market was able to negotiate a payment schedule secured by a financing statement on all of the companies' assets. Hartford's actions, however, triggered similar demands from the company's other bank creditor, Union Trust Company, and from its printer, Brown Printing Company, which was owed in excess of $250,000. In order to continue its operations, the company was constrained to meet these demands which, in Brown's case, required it to pay for printing and paper in advance and to pay monthly on its past due obligations with interest.

Market's dire financial position had additional consequences. In early 1975, Bruce Gordon & Company, the corporation's accountants, refused to work on the 1974 audit until its fees for the 1973 audit had been paid. Gordon, too, requested and received a rigid pay-out schedule, unsecured, which was satisfied by the company in September. Thereafter, Gordon did a preliminary survey of the corporation's books in preparation for the 1974 audit. After two or three days, Gordon informed Market that the 1974 audit would cost between $20,000 and $30,000, and that its preliminary examination disclosed that the corporation could not afford that amount.

In response to this deepening crises further economy measures were taken. *Book Production Industry* was sold for $10,000.00, Hanson and Spelbrink took 15% pay reductions, department heads were required to take 5% pay cuts, and some employees were laid off. Hanson and Spelbrink borrowed $14,000 and $30,000, respectively, and loaned these funds to the company.

By mid-spring of 1975 the defendant had concluded that the only way to stanch Market's cash hemorrhage was to sell some or all of the corporation's assets. After unsuccessfully contacting a number of potential purchasers,[2] Hanson began negotiations with Mr. Laurence Gralla ("Gralla") in September, 1975. Although approached with respect to the entire Market structure, Gralla was interested only in *HCPN*, and by mid-November of 1975, he had informed Hanson that he was prepared to make an offer to purchase that publication.

By this point in time the defendants had been informed by the corporation's attorney, Mr. Dennis Marlowe, that the only possible way for Market's shareholders to receive money from the sale of the corporation's assets was through a liquidation of the entire corporate structure under the provisions of Section 337 of the Internal Revenue Code, 26 U.S.C. § 337.[3] In response to this information the defendants began to consider the possibility of making offers for the remaining corporate assets.

On November 28, 1975, a meeting of Market's Board of Directors was held. The Board adopted a resolution that called for the complete liquidation of the corporation pursuant to Section 337. A shareholders' meeting was called for December 4, 1975 in order to present this plan to the shareholders for their approval. A second shareholders' meeting was called for December 24, 1975, to consider the specific transactions that had to be approved in order to execute the liquidation plan.

Additionally, on November 28, the Board accepted the resignation of two directors, Robert Dowling and Raymond Jones. Jones resigned because he had moved from the New Caanan vicinity. Dowling resigned because he was then negotiating the terms of an employment and non-competition agreement with Gralla, and felt that he

2. Contacts were made with American Can Company, Cahners Publishing Company, Magazines for Industry, Southam Co., Fairchild Camera, Chilton Industries, American Business Press and others. Two offers were received for a portion of the Market assets both were rejected as too low.

3. Section 337 makes the sale of corporation assets a nontaxable transaction when the sale is pursuant to a plan of complete liquidation and there is a final distribution to stockholders within twelve months of the adoption of the plan.

had to avoid this potential conflict of interest.

At the December 4th shareholders' meeting, Hanson and Spelbrink outlined the critical position of the corporation and indicated that they expected to have firm offers for the various corporate assets to present to the shareholders at the December 24th meeting. The shareholders then unanimously passed a resolution approving the general plan of liquidation under Section 337. At this same meeting the defendants solicited volunteers to fill the three vacancies on the Board of Directors. Mr. George O'Halloran and Mrs. Edith Gardner volunteered and were placed on the Board.

At a Board of Directors meeting held on December 12, 1975, Hanson again reviewed the financial situation of the corporation for the new directors and the efforts that he and Spelbrink had been making to find purchasers for the corporation's assets. Hanson then disclosed that Gralla had indicated the general outlines of an offer he planned to make for the purchase of *HCPN*. Hanson reported that Gralla said he was going to offer between $650,000 and $675,000 to the corporation, and was going to offer Hanson and Spelbrink between $50,000.00 and $75,000.00 each for non-competition agreements and from $40,000.00 to $50,000.00 each per year for two years for consulting services. Hanson also indicated that Gralla was attempting to conclude a similar arrangement with Dowling before making his offer firm.

Mr. O'Halloran responded to this presentation by objecting to these potential payments to the defendants and indicated that in his view all such payments should go to the corporation. Hanson and Spelbrink, in reply, observed that for tax reasons Gralla was unwilling to shift payments from them to the corporation and that, in any event, they were considering making offers to purchase the *Folio* and *Marketplace* operations, thus assuming some of the remaining corporate obligations, and would need the Gralla money to "swing" these offers. O'Halloran resigned from the Board at that meeting after expressing concern over directors' liability and citing his unfamiliarity with Market's operations.

Thereafter, Gralla made a firm proposal to purchase *HCPN* for $666,000.00 and to pay Hanson and Spelbrink each $186,000 over a three year period for consulting and non-competition agreements. This offer was described in an "announcement" mailed to the shareholders on December 19, 1975. Included in this announcement was information that the defendants would submit, at the December 24th meeting, offers "for all the remaining assets of the company," and that all other firm offers received prior to the close of business on December 22, 1975 would be submitted to the shareholders.

Subsequent to the December 12th meeting, a competing offer for *HCPN* was received from a Mr. Thomas Dempsey of the Industrial Publishing Company. The terms of Dempsey's offer were very similar to Gralla's proposal, and the defendants decided to invite both men to make direct presentations to the shareholders at the December 24th meeting.

The December 24th shareholders' meeting began with a presentation by Spelbrink regarding the corporation's current financial position. Spelbrink informed the stockholders that Market faced a current cash deficit of approximately $550,000. Mr. Anthony Blanco, the corporate comptroller, was present during the meeting to answer any shareholder questions prompted by Spelbrink's presentation.

At the conclusion of Spelbrink's presentation and the ensuing discussion, Hanson introduced Dempsey and Gralla for the purpose of having them describe their offers for *HCPN*. These competing offers, which were made contingent upon obtaining appropriate agreements with the defendants and Mr. Dowling were debated by the shareholders at great length. The shareholders' consideration of these offers was complicated by the fact that the offerors modified their "bids" on several occasions increasing their offers for *HCPN* while proportionately reducing the amounts offered to the defendants for consulting and non-competition agreements.

Thus, Dempsey's initial offer was $725,-000 for *HCPN* and a total of $186,000 to each of the defendants over a three year period. Gralla countered by offering $850,-000 for *HCPN* and a total of $120,000 for each of the defendants over a three year period. At one point Hanson stated that he would not accept $90,000 for a consulting and non-competition agreement.[4] Finally, after extensive discussion, Hanson proposed a resolution that Market's Board of Directors be authorized to conclude an agreement not later than December 31, 1975 with either bidder for *HCPN* at a minimum price of $850,000. The resolution was *not* conditioned upon any offer being made to the defendants for non-competition or consulting agreements. After a full discussion of this resolution it was adopted, with both the defendants and a majority of the minority shareholders voting affirmatively.

Immediately following the adoption of this resolution, the shareholders unanimously (with one abstention) adopted a resolution confirming the adopting of the plan of liquidation which had previously been approved, also by a unanimous vote, at the December 4th shareholders' meeting.

The last order of business taken up by the shareholders was the offers of Hanson and Spelbrink. Spelbrink's offer for the *Marketplace* publication was unanimously accepted by the shareholders. Hanson's offer was for *Folio, In-Service Training and Education,* and "Media Productions." This offer was accepted, with the defendants' shares and a majority of the minority shares being voted in its favor.[5] The details of the defendants' offers will be discussed hereafter.

The meeting was then recessed until December 30, 1975 at which time the responses of Gralla and Dempsey to the *HCPN* resolution were to be considered. On December 28, 1975, Dempsey and Gralla phoned in their offers to Dennis Marlowe, the corporation's attorney, at his office. Dempsey's bid failed to meet the $850,000 minimum imposed by the shareholders' resolution; Gralla's met this minimum price.

On the 30th the shareholders' meeting reconvened and Hanson announced that pursuant to the resolution of the 24th the Board of Directors had contracted to sell *Health Care Product News* to Gralla Publications at a price of $870,000.[6] He also disclosed that he and Spelbrink were receiving non-competition and consulting agreements amounting to $140,000 over three years and that Dowling was receiving $150,-000 over a similar period. A committee of Class A shareholders consisting of plaintiffs Abramson, O'Halloran, and Kay Zahner was appointed to represent the Class A stockholders in consulting with the officers and directors of the corporation regarding its orderly liquidation.

On January 6, 1976, documents were executed which effected the dissolution of Market and the sale of its assets. A common law trust was established with Hanson and Spelbrink as trustees for the purpose of winding up the affairs of the business. Hanson and Spelbrink agreed to compensation of $2,000 per month from the trust. They served as trustees until March 25, 1976 when they were relieved by plaintiff Jack B. Jacobs pursuant to an order of the Delaware Court of Chancery.

## PLAINTIFF'S ALLEGATIONS

As noted above, plaintiffs charge the defendants with both violating their fiduciary duty under Delaware law and violating Section 10(b) of the Act. It is important to recognize that these two theories of liability arise out of the same alleged conduct by the defendants; the asserted misrepresenta-

---

**4.** This rejection was apparently based on Hanson's belief that a payment of this amount would not be sufficient to allow him to purchase and operate *Folio* and the related properties.

**5.** Of the minority shares voted, 19,974 were voted in favor and 9,752 against.

**6.** Hanson and Spelbrink had asked Gralla to pay $20,000 more to Market in return for reduction of $10,000 each in the amounts due them under their personal non-competition and consultation offers.

tions and omissions were part of the means allegedly used by the defendants to accomplish what the plaintiffs claim were self-serving transactions. Thus, it follows that if the defendants are not guilty of using their corporate positions to enrich themselves at the expense of their fellow shareholders, i. e., the above-described transactions were "fair" to the corporation, then the plaintiffs cannot prove the injury element of a Section 10(b) violation. Therefore, I turn initially to plaintiffs' state law claim.

## THE STATE LAW CLAIMS

After carefully considering the trial testimony and exhibits, I have concluded that the record here simply does not support plaintiffs' allegations that the defendants breached their fiduciary duty to the corporation.[7] The evidence presented to the Court indicates that the non-competition and consulting agreements negotiated between Gralla and the defendants were desired by the purchaser and did not come, in any degree, at the expense of the corporation. The weight of the credible evidence also leads me to conclude that the defendants did not exploit their corporate positions to purchase certain of Market's assets at less than fair value. Finally, the record lends no support to plaintiffs' allegations that Hanson and Spelbrink collected excessive fees while serving as liquidating trustees or that the defendants made improper payments to the corporation's attorney, Mr. Marlowe.

With respect to the non-competition and consulting agreements negotiated by the defendants, the relevant question here is whether Mr. Gralla freely entered into these contracts in order to secure the defendants' assistance and prevent their competition, or whether the defendants abused their dominant corporate position to coerce these payments, thus reducing the price paid for *HCPN*. If Mr. Gralla genuinely desired these contracts and the price paid represented no more than his evaluation of the consideration he would receive from the defendants under them, then the defendants did not breach their fiduciary duty by their acceptance of those contracts; the defendants knowledge of and ability to compete in this field are quite clearly not corporate assets under Delaware law. *Smith v. Good Music Station, Inc.*, 129 A.2d 242 (Del. Ch.1957). If, on the other hand, Mr. Gralla was forced by the defendants to make these payments in order to purchase *HCPN*, then the defendants are guilty of breaching their duty to Market's shareholders. The evidence in this case, however, overwhelmingly supports the view that Gralla's contracts with the defendants did not come at Market's expense.

It should be noted initially that while the plaintiffs rely heavily on Hanson's statement during the December 24th shareholder's meeting that he would vote against a Gralla offer that provided he and Spelbrink with only $90,000 for their non-competition and consulting agreements, the subsequent shareholders' resolution authorizing and directing the sale of *HCPN* for any price in

---

7. I conclude that the burden of persuasion with respect to the fairness of the transactions in which Market disposed of its assets rests with the plaintiffs. They concede that the stockholder approvals of these transactions would place this burden on their shoulders if those approvals had been preceded by full and accurate disclosure of the relevant facts. They assert, however, that the record reveals "a glaring absence of candor, ... an overstatement of the alleged liabilities, and deception as to the nature and extent of the operating assets of the company." As will be discussed in more detail later in this Opinion, I do not agree. The evidence does not suggest that the facts and impressions conveyed by defendants in connection with these transactions were false or mis-

leading in any material way. There was full disclosure with respect to the defendants' interest in these transactions and the material negotiations took place in the course of the meeting itself. With respect to the financial condition of Market in late 1975, the most that can be said is that there was not as much reliable data available as a prudent investor might wish. But given the cash flow problems of Market, the need for immediate action, and the fact that defendants' presentation of the reliable data available was neither inaccurate nor misleading, this deficiency should not vitiate the effect of disinterested stockholder approval. I might add, however, that the preponderance of the credible evidence supports the fairness of these transactions to Market.

excess of $850,000 stripped the defendants of their ability to bargain for themselves at Market's expense. After the adoption of this resolution either prospective purchaser could buy *HCPN* without offering anything to Hanson and Spelbrink. Thus, Gralla's agreements with the defendants could not have resulted from coercion, as the defendants no longer possessed the authority to reject a bid meeting the $850,000 price.

Furthermore, Gralla testified that he entered into the non-competition and consulting agreements with the defendants, not in order to secure their votes for the sale, but because he needed their active cooperation in running *HCPN* during the transition period and because he feared their competition in this field. Additionally, the plaintiffs' expert witness, Mr. Giarraputo, testified at trial that the amounts of the defendants' non-competition and consulting fees were consistent with market standards, as did the defendants' expert witness, Mr. Kobak. The "reasonableness" of these fees lends credence to the view that they were determined by legitimate bargaining between the parties involved.

Finally, it should be recognized that the amounts offered to the defendants were the same as that offered to Mr. Dowling for his services. Dowling had previously resigned from Market's Board of Directors, and was thus not in a position to block the sale of *HCPN* even if he had desired to do so. Consequently, Gralla's willingness to make these payments to Dowling strongly suggests that he desired the cooperation of Market's top management independently of any ability they possessed to block his purchase of *HCPN.*

The record also fails to disclose any credible evidence that the defendants used their dominant corporate positions to purchase certain corporate assets at an unfairly low price. The transactions involved here are Spelbrink's purchase of the *Marketplace* publications and Hanson's purchase of the remaining corporate assets, *Folio, In-Service Training and Education,* and "Media Productions."

Spellbrink purchased the *Marketplaces* for $2,000 in cash, the assumption of $69,250 in Market liabilities, an agreement to pay fifty percent of any profits from the *Marketplaces* for the three following years, and a commitment to pay Market's shareholders one-third of the proceeds of any sale of these assets occurring within that three year period.[8] Plaintiffs assert that these assets were really worth $776,000 at the time of Spelbrink's purchase, and that this far exceeds the value of the consideration given by him.

The plaintiffs arrive at their valuation of these assets primarily by reference to a subsequent sale of the *Marketplaces,* to the Cliggot Publishing Company in December, 1979 for a total consideration of $932,000. After adjusting this figure to reflect the fact that Spelbrink had initiated publication of an additional *Marketplace* following the liquidation of Market which was included in the Cliggot sale, the plaintiffs' expert, Mr. Giarraputo, concluded that the assets purchased by Spelbrink from Market were worth $718,000 when purchased by Spelbrink in 1975. Mr. Giarraputo's methodology is, however, quite obviously flawed in a number of important respects.

8. Spelbrink's offer is reflected in the following segment of the meeting of December 24, 1981:

Would anyone like to have Al's offer restated? Al, would you restate your offer? Received the business of Market Place, trademarks, and copyright, physical assets being used by employees, contracts on hand, cash zero, related inventory of goods for professional shopper. Will give $2,000, assumption of share of liabilities, one-half to rent $54,000, one-half to telephone equipment $15,250, total of $69,250. Half of pre-tax profits for first three years, maximum salary $30,000, expenses reasonable, subject to audit AAS will abide by. In case of sale during the three-year period, one-third of total price including salary, non-compete contracts, etc. would be distributed to the corporation or the stockholders.

(Asks about price).

One-third of the total price.

One-third of the price is either paid to his corporation, to him. Any sort of value he gets no matter how it is, he will kick back a third of it.

In arriving at his valuation of these assets, Mr. Giarraputo failed to subtract from the total consideration paid by Cliggot the $550,000 agreement for Spelbrink's personal services. This omission is particularly surprising in light of Mr. Giarraputo's testimony that he had assumed for purposes of his analysis that the Cliggot-Spelbrink deal was an arms-length fairly negotiated transaction, and his acknowledgement that the buyer and seller had, for tax reasons, conflicting interests in apportioning the total consideration between the personal service and asset components of the transaction. Because this apportionment was arrived at through arms-length bargaining, there appears to be no justification for including the value of Spelbrink's personal services contract with Cliggot in assessing the *Marketplaces*' value as of late 1975.[9]

A second flaw in Mr. Giarraputo's use of the Cliggot purchase of the *Marketplaces* to assess the value of these assets as of 1975, was his failure to adjust the comparison to reflect the $295,000 in long term debt that was incurred by the corporation in order to keep the *Marketplaces* afloat during the 1976–79 period.[10] The $250,000 in cash received from Cliggot merely allowed Spelbrink to discharge, in part, these obligations. Therefore, it does not follow that Spelbrink's receipt of $250,000 in cash for the *Marketplaces* in 1979 implies that these assets were worth $250,000 or more in 1976, as Mr. Giarraputo appears to have assumed. A proper comparison of the Cliggot transaction with the 1976 Spelbrink purchase required that the raw purchase price be adjusted to eliminate the indebtedness incurred in order to operate these properties.

When the two above-described flaws in Mr. Giarraputo's "comparative" approach are corrected for, and an inflationary factor is applied to reduce the 1979 purchase price to 1976 constant dollar terms, it appears that the relevant *Marketplace* assets were worth substantially less than $100,000 in 1976.

Furthermore, the defendants point to additional considerations which, even apart from the above-described flaws in Mr. Giarraputo's analysis, make the "comparative" approach inappropriate here. One such factor is the different economic conditions in effect when the two transactions took place; Spelbrink's purchase occurred during a recession, while Spelbrink sold in comparatively good times. Thus, this circumstance would by itself skew any attempt to determine the value of the *Marketplaces* in 1976 by reference to their late 1979 purchase price.

Moreover, as a result of Spelbrink's personal efforts and investment and a general upturn in the nation's economy, the number of future advertising commitments delivered to Cliggot were 3½ times the number acquired by Spelbrink. This fact also makes it difficult to accept the Cliggott purchase price as a reliable measure of the value of these assets in 1976.

In contrast to the plaintiffs' estimate of the worth of the *Marketplaces* as exceeding $700,000 in early 1976, the defendants assert that these assets had little more than nominal value, arguing for a figure of approximately $25,000. In support of their position the defendants offer the testimony of Mr. James Kobak. Mr. Kobak has been an active participant in the publications industry for many years and has had extensive experience in evaluating publishing properties. After studying the operations, financial status, and marketability of the *Marketplaces* from the perspective of a potential purchaser at the close of 1975, Mr. Kobak reached the valuation cited above.

As indicated above, the Court finds the valuation suggested by the defendants to be far more realistic than the estimate submitted by the plaintiffs. The method of valuation adopted by the plaintiffs' expert is both inappropriate here and flawed in its

**9.** Giarraputo acknowledged that Spelbrink's talents were not assets of Market.

**10.** By December 31, 1978 Mr. Spelbrink had been required to advance $155,158 of his personal funds to keep *Marketplace* afloat. Moreover, by October 31, 1979, *Marketplace* had lost an additional $45,975 and its loan indebtedness totalled $295,000.

execution. Indeed, when the necessary adjustments are made in this comparison, it appears to confirm the defendants' contention that these assets had relatively little value in 1976. In contrast to the "comparative" technique relied on by the plaintiffs, the approach taken by Mr. Kobak reflects the actual procedure used by sophisticated traders such as Mr. Gralla.

Additionally, there is persuasive circumstantial evidence which buttresses the defendants' position. I refer here to the fact that Spelbrink's purchase of these assets was unanimously approved by the minority shareholders present at the December 24th meeting. Market's shareholders included many individuals knowledgeable in the publishing industry and familiar with Market's operations, including many members of the plaintiff class. While these individuals admittedly did not have access to accurate, up-to-date financial information regarding these assets, their unanimous approval of Spelbrink's offer would indeed be surprising if these assets had even a small fraction of the value claimed by the plaintiffs.

In light of the above, I reject the plaintiffs' claim that Spelbrink abused his corporate position to purchase Market's assets at less than fair value. The evidence indicates a value for the purchased assets of about $25,000 as of the end of 1975. On this basis, I conclude that Spelbrink's cash payment, his assumption of $69,000 in liabilities, and his commitment to share any profit gained in the three years following the sale constituted adequate consideration for the *Marketplaces.*[11]

The evidence offered in this case also fails to support the allegations made against Mr. Hanson regarding his asset purchases. Under the terms of the agreement approved at the December 24, 1975 meeting, Hanson received the good will, contracts and operating assets of *Folio, Publishers Resources, Media Productions* and *In-Service Training and Education* in return for the payment of $6,500 in cash, the assumption of $116,000 in liabilities associated with those publications,[12] and an undertaking to fulfill their subscription obligations.

Here again, the Court is faced with radically different assessments of the value of these properties as of early 1976. The plaintiffs assert a value of between $360,-000 and $540,000; the defendants counter with a valuation of between $50,000 and $60,000.

Both sides agree that of the properties acquired by Hanson, *Folio* had the greatest value.[13] Because the *Folio* properties have not been subject to resale, Mr. Giarraputo adopted another valuation technique. The starting point for Mr. Giarraputo's analysis was *Folio's* sales figure of $728,000 in 1975. He then concluded that "a knowledgeable buyer ... could reasonably assume that it (*Folio*) could earn 5% of sales after taxes in the future," or $36,000. Capitalizing at ten to fifteen times these hypothetical earnings, Mr. Giarraputo arrived at his range of value for the *Folio* assets.

I am unpersuaded by Mr. Giarraputo's unconventional analysis. Mr. Giarraputo himself acknowledged that he knew of no actual instance in which any magazine had been priced by this technique; nor could he point to an actual transaction which by result proved his methodology. More importantly, however, Mr. Giarraputo's analysis glosses over a number of highly relevant facts. Two examples will suffice. First, he simply ignored the fact that *Folio,* on its

---

11. Plaintiffs point out that $54,000 of the liability assumed was an obligation under the lease for the space occupied by Market. They correctly assert that if Spelbrink had not assumed this liability and Market had defaulted, the landlord would have had a duty to take reasonable steps to locate another tenant and thereby mitigate damages. It is nevertheless clear that the assumption of this liability was of substantial value to Market.

12. Most of these liabilities ($107,863) represented liabilities of Market under office space and equipment leases.

13. *In-Service Training and Education* was sold by Hanson in 1976 for $6,800 payable over three years. "Media Productions" was sold to Fred Bunting, and ultimately yielded a profit of $18,000 but only after an additional $89,000 had been invested by Hanson to complete its contracts.

1975 revenues of $728,000 had lost $149,000. This oversight freed Mr. Giarraputo from confronting the difficult question of why any reasonable buyer would assume that the *Folio* assets that had lost $149,000 in 1975 would yield $36,000 in after tax profits on the same sales volume in 1976. Second, Mr. Giarraputo's "knowledgeable buyer" was also remarkably indifferent to the need for working capital to operate a magazine. Nowhere in his analysis of *Folio* is there a suggestion that working capital requirements might be a relevant factor to a prospective purchaser in formulating a bid. The omission is also a crucial one. After all, it was the want of operating capital which had driven Market to the brink in the first place.

By contrast, Mr. Kobak's evaluation of *Folio* started not with sales, but with its profit and loss history and an analysis of revenue and cost trends. Mr. Kobak's evaluation also took into account such relevant factors as its market for advertising, its circulation market, the number of its employees, its salary structure, the economic climate in the publishing industry, and the fact that *Folio* was closely identified with and highly dependent upon one man, Joseph Hanson. I found Mr. Kobak's assumptions to be reasonable and his reasoning to be persuasive. Accordingly, I accept his opinion that all of the assets acquired by Hanson from Market had a fair value in the neighborhood of $50,000 to $60,000.

Mr. Kobak's estimation is again supported by the circumstances surrounding the sale of these assets. Once again, I find it significant that Market's minority shareholders overwhelmingly approved the sale to Hanson and none of these individuals submitted competing bids for the allegedly very valuable *Folio* properties.

Additionally, the Court notes that the very modest earnings derived from these assets in the 1976–78 period are entirely consistent with the valuation asserted by the defendants, but inconsistent with the high value claimed by plaintiffs.[14]

Based on the Kobak evaluation, I conclude that Market received fair value from Mr. Hanson. While his cash payment was relatively small, he assumed very substantial liabilities, most of which would otherwise have had to have been paid from the trust in liquidation. Mr. Hanson testified without contradiction that, in addition to his assumption of Market's liabilities under its equipment and real estate leases, he assumed a net *Folio* subscription liability of $50,993.

Turning to plaintiffs' allegations regarding the defendants' trusteeship fees and attorneys' payments, the claims asserted in these areas do not require extensive comment. Hanson and Spelbrink were paid for their services as liquidating trustees at the rate of $2,000/month each for the period of two and two and one-half months respectively. Hanson testified that this compensation was agreed to by the minority stockholders at the December 30, 1975 meeting. Mr. Abramson, a named plaintiff, was present at the meeting, yet did not testify at trial. Therefore, I may conclude that his testimony would not contradict Hanson's on this point. *See, e. g., Jett v. The Texas Company*, 73 F.Supp. 699, 704 (D.Del.1947). This agreement not only establishes that payment of the challenged fees were authorized, but also creates a strong presumption in favor of their reasonableness. Moreover, these payments seem quite modest when viewed in the light of the activities undertaken by Spelbrink and Hanson on behalf of the trust and the fact that they were able during their trusteeship to negotiate a $63,000 reduction in the corporation's accounts payable.

With respect to the legal fees paid Mr. Marlowe, the plaintiffs were unable to provide any evidence to support their allegation that Market paid for services rendered to the defendants personally. Furthermore, the Court is fully satisfied that the payments to Marlowe that are at issue here

14. Folio showed a total profit of less than $7,000 during the course of this three year period. Moreover, Hanson's salary draws during the period were $17,500 (1976), $21,800 (1977), and $16,800 (1978).

were reasonable in light of the extensive time he devoted to Market's legal problems.[15]

### THE SECTION 10(b) CLAIMS

The Court's findings with respect to plaintiffs' state claims make it unnecessary to examine the Section 10(b) claims in great detail. Even if the other elements of a Rule 10b–5 violation had been proven, there has been no showing of injury resulting from such a violation.

 Even apart from the question of injury, however, the plaintiffs have failed to establish a Section 10(b) violation in this case. The essential elements of a Section 10(b) and Rule 10b–5 violation have been summarized by this Court in *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228, 1236 (D.Del. 1978). In order to prevail, a plaintiff must prove that: (1) the violation was in connection with the purchase or sale of a security; (2) material misrepresentations or omissions were made; (3) there was a causal relationship between the violation and some injury; and (4) the defendant acted with some form of scienter beyond mere negligence. While this Court has previously ruled that the dissolution and liquidation of Market was a "sale" of securities to which Section 10(b) is applicable,[16] the evidence presented at trial falls far short of establishing the other necessary components of this claim.

I will consider the variety of misrepresentations or omissions alleged by plaintiffs in the order in which they are alleged to have occurred. The defendants' initial deception is asserted to have been their failure to notify the minority stockholders of their plan, allegedly formulated in late November 1975, to sell *HCPN* and purchase the remaining properties themselves. This omission was designed, claim the plaintiffs, to make it easier to win the minority shareholders' approval of these transactions when they were ultimately disclosed at the December 24th meeting.

 The sole evidence introduced by plaintiffs to establish the existence of such

a plan, however, consists of the two memoranda written by Hanson to Spelbrink on November 19th and 20th. An examination of these memoranda reveals quite plainly that Hanson is attempting to *persuade* Spelbrink of the fairness of his *proposed* division of the remaining corporate assets and liabilities after any possible sale of *HCPN*. Consequently, plaintiffs have failed to prove the existence of any agreement in November of 1975 that the defendants allegedly concealed. Additionally, even assuming *arguendo* that such an agreement was concluded in late November, given the absence of any plan to defraud Market, I fail to perceive how the existence of that agreement at that time would have been material to any decision the stockholders were called upon to make. The parties agree that Market's stockholders had only one rational course open to them at the December 4, 1975 meeting. The circumstances dictated that they approve a plan of complete liquidation pursuant to Section 337. At least in this context, the fact that two stockholders had agreed to bid on certain assets, if it had been a fact, would not have held any significant potential for effecting a stockholders' vote on that proposal. As far as subsequent decisions with respect to asset sales are concerned, each of these decisions were made with knowledge of the intentions of Spelbrink and Hanson and, accordingly, any failure to disclose the existence of an earlier agreement would be immaterial. Finally, the evidence does not suggest that the defendants' failure to immediately disclose the discussions between themselves was motivated by an attempt to deceive or mislead the shareholders.

 The defendants are also accused of illegally concealing information from the minority stockholders regarding their negotiations with Gralla for the sale of *HCPN*. Hanson and Spelbrink, it is claimed, reached an agreement "in principle" with Gralla for the sale of *HCPN* as early as November 25, 1975, yet failed to alert the

---

15. *See* Marlowe Dep. pp. 27, 35–36 and PX 87.

16. *Jacobs v. Hanson*, 464 F.Supp. 777 (D.Del. 1979).

shareholders of this agreement or to their conflict of interest in simultaneously negotiating consulting and non-competition agreements for themselves. Plaintiffs, however, are unable to substantiate these allegations. First, Mr. Gralla's deposition testimony establishes that there was no "agreement in principle" by November 25th. Thus, there was nothing of significance to report to the shareholders at that point in time. Secondly, even assuming that there had been an "agreement in principle" reached as of that date, any failure to immediately disclose this fact, once again, would not have been material and would not have been accompanied by the requisite scienter.

■ With respect to the defendants' alleged failure to disclose their potential conflict of interest in negotiating the sale of *HCPN*, it is safe to say that this conflict was so obvious that it could not have escaped the attention of any shareholder. Moreover, this conflict was openly discussed at length at the December 24th meeting before any votes were taken. Finally, the shareholder resolution of December 24th authorizing the sale of *HCPN* had the effect of precluding the defendants from negotiating agreements with Gralla at Market's expense. Thus, it is quite clear that the defendants' failure to expressly declare to Market's stockholders that "we are in a position of conflict of interest" had no impact on subsequent events.

■ Plaintiffs would also have this Court find a Section 10(b) violation in the defendants' failure to provide the minority shareholders with more corporate financial data. Defendants' answer to this allegation is that no accurate financial data existed which was not disclosed. The record supports this answer. The last audited statement was for the 1973 fiscal year; Bruce Gordon & Company, the corporation's auditors, had refused to undertake the 1974

audit because Market could not afford to pay them for it. The record indicates that the corporation's internal, unaudited financial records were substantially inaccurate, and that the hazards associated with dissemination of it to stockholders would have been substantial.[17] More importantly, however, plaintiffs have submitted no evidence of a fact about Market's condition in December of 1975 which would render any material representation or omission of defendants' at that time false or misleading. In the absence of such evidence, there can be no Section 10 liability.

■ Plaintiffs also claim to find a Section 10(b) violation in Spelbrink's financial presentation to the shareholders made at the start of the December 24th meeting. Plaintiffs assert that this presentation was misleading because it failed to include the value of certain corporate assets such as *HCPN*, and certain miscellaneous items such as inventory, furniture, fixtures, etc. Plaintiffs' argument, however, mischaracterizes Spelbrink's presentation. That presentation purported to do only one thing—inform the shareholders of Market's current *cash* position as of November 30, 1975.[18] Spelbrink indicated, on the basis of admittedly unaudited financial data, that the corporation faced a cash deficit of $516,000. Plaintiffs do not contest the essential accuracy of that figure, and in fact, the corporate tax return for 1975 which was prepared at the direction of plaintiff-trustee Jacobs, shows a negative net worth for the corporation of $544,000 as of the end of 1975. Since the information conveyed by Spelbrink was not misleading, he did not violate Section 10(b) in this presentation.

■ With respect to plaintiffs' allegations regarding Hanson and Spelbrink's written offers for the *Folio* and *Marketplace* properties, it may simply be stated that the elements of deception and scienter

---

17. While the defendants decided not to distribute these data, they did not attempt to conceal it. Defendants were willing to supply it to those who requested access and they made Mr. Blanco available at the December 24th meeting to supply whatever information was available.

18. The import of this presentation was that Market faced imminent insolvency if prompt action was not taken. The evidence confirms the accuracy of this message.

are again unproven. In particular, I note that the evidence directly contradicts plaintiffs' claim that Hanson concealed from the shareholders the fact that he expected to receive certain sums from the resale of "Media Productions" and *In-Service Training and Education.*

 Finally, regarding plaintiffs' allegation that the defendants falsely stated at the beginning of the December 24th meeting that they would vote their shares in accordance with the wishes of the majority of Class A (minority) stockholders, it may simply be said that the record reveals no evidence of any such promise. In fact, the transcript of that meeting suggests that the defendants expressly refused to so commit themselves.

## CONCLUSION

The plaintiffs' theory in this case has been that the two majority stockholders of Market secretly devised a scheme to defraud its minority stockholders pursuant to which the corporate assets would be sold and the corporation dissolved on terms favorable to the majority stockholders and unfavorable to the minority stockholders. This scheme, according to plaintiffs, was thereafter executed through a series of fraudulent misrepresentations and concealments. The evidence shows, however, that the liquidation and dissolution of the corporation was a product of its precarious financial condition rather than any scheme of the majority stockholders, that the disposition of its assets was on terms fair to it and its minority stockholders, and that the majority stockholders were not guilty of any material deception. Accordingly, judgment will be entered in favor of the defendants.